USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:_____
DATE FILED: 7/10/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

UNI-WORLD CAPITAL L.P., UNI-WORLD CAPITAL
AIV, L.P, FRAGRANCE HOLDINGS, LLC and
FRAGRANCE ACQUISITIONS, LLC,

                              Plaintiffs,

              -v-

PREFERRED FRAGRANCE, INC., HARRY
POLATSEK, EZRIEL POLATSEK, SARAH
POLATSEK, SOLOMON TYRNAUER,
BENT PHILIPSON, BENJAMIN LANDA,
and JOSEPH RUBINSTEIN,

                           Defendants.

-----------------------------------------------------------------------X

13 Civ. 7204 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      This litigation, presently in mid-discovery, involves claims arising out of plaintiffs'

acquisition of an imitation-fragrance business.  Plaintiffs claim, *inter alia*, that they purchased

that business based on misrepresentations from defendants.   Pending before the Court now is a

motion by plaintiffs for a preliminary injunction to prevent defendant Ezriel Polatsek from

competing with the business they acquired from him.  The Court finds that Polatsek, in violation

of two binding non-compete agreements, has competed with plaintiffs' business and that, absent

an injunction, he is likely to continue to do so.  Accordingly, and for the reasons that follow, that

motion is granted.

## I.      Background to the Present Motion

Ezriel Polatsek (hereinafter, "Ezriel")[1] was the founder and CEO of Preferred Fragrance, Inc. ("Preferred Fragrance"), which sells imitation perfumes.  In October 2011, Ezriel and his fellow stockholders sold Preferred Fragrance to plaintiffs.  As part of that transaction, Ezriel became president and chief operating officer of the new company, Fragrance Acquisitions, LLC ("Fragrance Acquisitions"), and he signed a pair of non-compete agreements.  In October 2013, Fragrance Acquisitions fired Ezriel.  Plaintiffs then brought this action.  They alleged, *inter alia*, fraud in connection with the sale of the company.  Relevant here, they also alleged that Ezriel had violated his non-compete agreements by engaging in the fragrance business in connection with two entities, Exceed LLC ("Exceed") and Ouleaf, that competed with plaintiffs' business.

On March 3, 2014, plaintiffs applied for a temporary restraining order and preliminary injunction to prevent Ezriel from violating the non-compete agreements.  *See* Dkt. 52.  They did so based on limited documentary evidence, including an email chain errantly sent to Ezriel at Fragrance Acquisitions that seemed to indicate that he was aiding a competitor.  The email chain concerned a fragrance-related project that Ezriel and Exceed had evidently entered into with a modeling company, Wilhelmina; plaintiffs also adduced evidence that Ezriel later attended a Wilhelmina meeting on February 28, 2014.

On March 14, 2014, after briefing, the Court issued an opinion from the bench, denying the motion without prejudice, on the grounds that plaintiffs' evidence, although suggesting that Ezriel might be violating the non-compete agreements, was not strong enough to prove that so as to show a likelihood of success on the merits.  Dkt. 101.  The Court, accordingly, set a schedule

---

[1] The Court refers to each Polatsek by first name, because multiple Polatseks are involved in this lawsuit.

for expedited discovery with regard to the issue of whether Ezriel had violated the non-compete agreements, and granted plaintiffs leave to renew their motion for a preliminary injunction if such discovery strengthened their claims. *Id.*; *see also* Dkt. 68 (order incorporating by reference Court's opinion from the bench).

On May 1, 2014, after expedited discovery had been taken, plaintiffs renewed their motion for a preliminary injunction. Dkt. 113. On May 22, 2014, after briefing, the Court heard argument. Dkt. 137. Although plaintiffs' documentary evidence was substantially stronger than earlier, the Court stated that, in the interest of reliably resolving the motion, it would benefit substantially from hearing live testimony by Ezriel and his brother, Abraham Polatsek (hereinafter, "Abraham"). *Id.* Plaintiffs allege that Ezriel assisted Abraham, a former Preferred Fragrance employee, in competing fragrance ventures at Exceed and Ouleaf.

The Court heard live testimony from Ezriel (on June 11, June 26, and June 30, 2014), and live testimony from Abraham (on June 30, 2014). The Court also received substantial documentary evidence at these hearings.[2]

## II.    The Court's Findings of Fact

The following are the Court's findings of fact. The Court's conclusions of law follow. As noted, the evidence, documentary and testimonial, is compelling that Ezriel has violated his non-compete agreements, on a number of occasions and in connection with multiple competing or potentially competing entities. As noted *infra*, the Court finds that the testimony of both Ezriel and Abraham was, on various points, not credible. In so finding, the Court has been

---

[2] "Tr." refers to the transcript of the hearing. "PX" and "DX" refer to exhibits received from plaintiffs and defendants, respectively, at the hearing.

mindful that English is the brothers' second language,[3] and that latitude is properly given them to reflect the alien nature of formal interrogation in a second language by an adversary in a deposition or in court. But even giving a wide berth for innocent error, enough of the brothers' testimony was so substantially impeached—including by documentary proof or other testimony, and at points by its inherent illogic—that the Court is constrained to conclude that Ezriel and Abraham at points gave knowingly untruthful testimony to the Court. These adverse credibility findings contributed to the Court's determination that Ezriel has violated the non-compete agreement and that there is a substantial likelihood that he will continue to do so absent a preliminary injunction.

### A. Preferred Fragrance

In or around 2000, Ezriel and his wife started the perfume business that became Preferred Fragrance. Tr. 7, 9; Dkt. 55 ("Palmer Aff.") ¶ 4. Initially, the business was small and was based in the Polatseks' home. Tr. 7, 9. Ezriel later came across technology that would allow him to reverse-engineer the chemical composition of perfumes; Preferred Fragrance began creating and selling "designer-inspired," or imitation, perfumes, *i.e.*, perfumes with smells akin to, and names reminiscent of, designer perfumes. Tr. 7–8.

Preferred Fragrance began to grow rapidly, at a rate of 30 to 40 percent per year. Tr. 12. The number of employees increased every year such that, in 2011, when Ezriel sold the business, it employed 20 people in the office and in sales, and 40–70 people in the warehouse. Tr. 10.

---

[3] Ezriel and Abraham grew up speaking Yiddish at home. Tr. 6. Both received an entirely Jewish education; neither brother has any secular education. Tr. 5–6, 269. Ezriel testified, and the Court verifies, that he can speak English reasonably well, but that his ability to read English is limited. Tr. 5–6. Abraham did not testify to his ability to speak and read English, but from the Court's observation, he is fluent in spoken English but his facility is somewhat more limited than Ezriel's.

The employees included Ezriel's father, Harry, who was chief financial officer; his brother Abraham, who managed the warehouse; his brother-in-law, who worked in the warehouse; and two cousins, who worked in customs clearance and in purchasing, respectively.  Tr. 11; Palmer Aff. ¶ 4.  The perfume bottles were filled by JP Filling, a company owned by Ezriel's brother Joel; Ezriel put Joel in business.  Tr. 10–11.

As Preferred Fragrance grew, it became too large and complicated for Ezriel and his wife to manage.  Tr. 12.  Ezriel reached out to a broker to find a buyer.  Tr. 12.  In early 2010, plaintiffs expressed interest.  Tr. 13–14.

On October 11, 2011, plaintiffs purchased the assets and business of Preferred Fragrance for $24.5 million, of which $16.837 million was paid in cash and the remainder in membership interests in the new holding company, Fragrance Holding, LLC.  Dkt. 115 ("Steel Decl.") Ex. B ("Asset Purchase Agreement" or "APA") § 2.2; Palmer Aff. ¶ 5; PX 30 (also filed as Dkt. 63) ("Ezriel Decl. I") ¶ 7.  Ezriel received the membership interests, which amounted to 18.16% of the outstanding voting equity of Fragrance Holdings, LLC, and cash; the other stockholders of Preferred Fragrance received only cash.  APA § 2.2; Palmer Aff. ¶ 5.

As part of the transaction, Glenn Palmer became CEO of the new company, Fragrance Acquisitions, which continues to do business as Preferred Fragrance; Ezriel became president and chief operating officer.[4]  Palmer Aff. ¶¶ 1, 3; Steel Decl. Ex. C. ("Employment Agreement") ¶ 1.  Ezriel also understood himself to be director of sales.  PX 58 (also filed as Dkt. 120) ("Ezriel Decl. II") ¶ 4; *see also* Tr. 16 ("My goal [in the transaction] is to be busy with sales; my wife, product development.  And execution, all this, this should be the part of Uni-World. . . .  I

---

[4] The Court refers to the company before the purchase as Preferred Fragrance, and after the purchase as Fragrance Acquisitions.

should be able to do my job, sales, what I love to do."); Tr. 27 ("[M]y understanding is that sales is my department.").

Also as part of the transaction, Ezriel entered into two nearly identical non-compete agreements.  In the APA, Ezriel agreed that, for five years after the closing date of October 12, 2011, he would not

> directly or indirectly . . . own, manage, operate, join, control, participate in, invest in or otherwise be connected or associated with, in any manner . . . any business or venture which, directly or indirectly, competes with the Business within the territories in which the products of the Business are sold (which includes the United States of America, its territories and possessions, and any country outside of the United States of America to which products of the Business are sold).

APA § 6.1(a); *see also id.* § 1.1 ("'Business' means the production, marketing and distribution of designer-inspired fragrances, private label fragrances, proprietary fragrances, and licensed celebrity fragrances as conducted by or on behalf of the Companies.").  In the Employment Agreement, Ezriel agreed to a non-compete agreement identical in substance to the APA's non-compete agreement, except that it is operative "during the time of his employment with [Fragrance Acquisitions] and for a period of three (3) years after the termination of his employment."  Employment Agreement § 7(D).[5]

At the time he sold Preferred Fragrance, Ezriel was aware of the non-compete agreement and understood its gist, although, as developed below, the parties dispute whether he understood its geographic reach.  Tr. 16 ("Q.  As part of the sale to Uni-World, were you aware there was a non-compete?  A.  Yes."); Tr. 17–18 ("THE COURT:  . . .  Tell me what your understanding was of the non-compete provision.  THE WITNESS:  For five years after I'm going away from the

---

[5] Because Ezriel was terminated on October 10, 2013, the non-compete restriction in the Employment Agreement terminates on October 10, 2016, one day before the APA's non-compete terminates on October 11, 2016.  Ezriel Decl. II ¶ 7.

company, I'm not allowed to sell perfumes, to help someone selling perfumes, to be involved in a company from perfumes, anything that have to do with fragrance."); Tr. 19 ("THE COURT: And did you understand that there was a non-compete that applied to you while you remained a partner in the company?  THE WITNESS:  Sure.").

### B.  Fragrance Acquisitions

Ezriel testified, and the Court credits for the purpose of this motion, that, after plaintiffs acquired Preferred Fragrance, there was much tension and conflict between Palmer, the CEO of the new company, Fragrance Acquisitions, and the sales staff.[6]  Palmer ultimately "fired a lot of [Ezriel's] salespeople," Tr. 23, such that the original sales staff of six or seven people was reduced to two, Tr. 26.  Ezriel appears to have been distressed by these events.[7]

Ezriel was also upset that the new management did not allow him to run the sales department as he saw fit.  Tr. 27.  He explained:

> Uni-World start[ed] focusing very much [on] what I'm doing on sales, instead of putting a whole effort into infrastructure, what I need, coming to meetings and give me rules how to sell, what to sell, whom to speak, what to speak.  And to put a lot of them in sales sometimes have a very, very bad reaction.
>
> . . .
>
> Our company is – we don't have a brand name to dictate.  So everything is based on relationships. . . .  [F]or example, I have a customer, Rainbow. . . .  And this was a good customer.  It's a 3-, 4-million-dollar account for me. . . .  [I]t's not an easy account.  They have – they give a lot of business, take a lot of advantage. . . .  [J]ust

---

[6] *See* Tr. 23 ("[T]he people who was working there have a lot of issues, and I have – every few minutes was another issue with the other guy. . . .  [It became] so uncomfortable for the sales people that they don't want to come and they don't want to do."); Tr. 25 ("I have one of the salespeople . . . Glenn told her, I hate you with passion.  When you talk, you make me nervous.  Please don't talk. . . .  The whole day I was become in middle between Glenn and my salespeople, the whole day.  Please, don't cut the commission.  Yes, cut the commission.  Yes.  No.  Constantly was these issues.").

[7] *See* Tr. 20 ("[M]y [sales] team was basically destroyed, slowly but surely."); Tr. 26 ("[M]y salespeople for the last ten years is like such a great team.").

one example, it came to a point that they ask me, we're not making enough money. We need to have our price increase.  Instead of $1.45, we have to have $1.50.  So I explain for them Avery Tuchman [the CFO of Fragrance Acquisitions], the buyer, is tough.  Let's go to the buyer and let's talk to them.  So they make a decision to go to more – to the people who owns the chain . . . .  [W]hen I went to the buyer, the buyer found out that I went to the boss.  And she was really, really pissed to me and the company.

. . .

Things like this happen every day in my business.   And I went and I complain and cry to Uni-World . . . with my father, and explain constantly that they're doing a good job on one side in infrastructure, but to pushing the sales and the way they're behaving is trying to be like – come to buyers and say, no, this is the rule.  It's not going to work.  And they told me constantly, yes, they're going to fix it.  They will see and they understand me.  They're going to talk.  But this was the part where I see the company start going down and competition comes in.

Tr. 20–22.

In late 2011 or early 2012, Ezriel's brother Abraham, who managed the warehouse, was fired.  Tr. 283.

In early 2013, Abraham (who was not subject to a non-compete restriction) participated in the creation of Ouleaf, a competitor of Fragrance Acquisitions.  Tr. 274–76.  As discussed in greater detail *infra*, the parties dispute the extent and nature of Ezriel's involvement in Ouleaf.

On April 8, 2013, Fragrance Acquisitions sent most of the defendants here—Preferred Fragrance, Ezriel, and the Preferred Fragrance stockholders who signed the APA—a letter stating that it would seek indemnification for more than $5.5 million in lost profits.  Dkt. 39 ("Dockwell Decl.") Ex. D.  Plaintiffs claimed they had been misled to believe the company was more valuable than it in fact was, and thereby overpaid for the company, as a result of various misrepresentations and omissions by defendants in connection with the company's sale.  *Id.*

8

On June 12, 2013, a new company, Exceed, was formed.  PX 34.  As discussed in greater detail *infra*, the parties dispute the nature and extent of Ezriel's involvement in Exceed (both its creation and its business).

Between June and early September 2013, the parties attempted, via negotiations, to resolve plaintiffs' claim for indemnification and related issues.  Dkt. 44 Ex. 3 ("Fuller Aff.") ¶¶ 4–5.  These discussions reached an impasse.  On or around September 10, 2013, plaintiffs' counsel told defendants' counsel that plaintiffs would be moving toward litigation.  Dkt. 44 Ex. 1 ("Koval Decl.") ¶ 7.  On September 13, 2013, however, before such litigation was filed, Preferred Fragrance and Ezriel filed an action in New York Supreme Court in Kings County, seeking declaratory judgments:  that (1) Preferred Fragrance and Ezriel had not breached the APA and thus were not obliged to indemnify the Fragrance Entities for lost profits, and (2) Ezriel's non-compete agreements were void and unenforceable.  *Preferred Fragrance, Inc., et al. v. Fragrance Acquisitions, LLC, et al.*, Index No. 505426/2013 (N.Y. Sup. Ct. filed Sept. 13, 2013) (the "Brooklyn Action").

On October 10, 2013, Fragrance Acquisitions fired Ezriel.  Ezriel Decl. I ¶ 13.  At the hearing, Ezriel explained his firing, and the events that preceded it, as follows:

> It came to a point that I complaining and complaining to the board that the company goes down, and I warned them, and they told me I agree 100 percent.  They told me they're going to send in a coach, I don't know what it is, to teach Glenn to behave with the people.  And they're going to put Avery – they're going to talk to him.  I see things not getting better, and I'm start complaining, and people left the company.

> Chris Fuller called me and hand me over a letter why I'm terminate[d] from the company.  And a day before Glenn told me that it's going to be, and he feels bad for me, and he knows most of the things what in the letter says is not true.  But you have to understand, I'm an employer and I have to do what I have to do.  And don't take it personal.  Things will work out.  And a day later they gave me a letter that I'm fired from the company.

Tr. 24.

On October 11, 2013, the day after plaintiffs fired Ezriel, they brought this lawsuit, claiming securities fraud, common law fraud, and breach of contract, and seeking declaratory judgments that the termination of Ezriel's employment had been for cause and that the non-complete clause was valid and enforceable.  Dkt. 1.[8]

### C.  Abraham Polatsek

Abraham is 10 years younger than Ezriel.  Tr. 31.  He attended yeshiva until age 21. Tr. 269.  Abraham then looked for a job for about a year and a half.  Tr. 299.  He was then hired to manage the production line at Joel's company, JP Filling, which fills perfume bottles for Preferred Fragrance.  Tr. 269–70, 299.  Abraham worked at JP Filling for between one and three years.  *Compare* Tr. 270 ("around two, three years") *with* Tr. 299 (one year).

Abraham left JP Filling to become warehouse manager at Preferred Fragrance.  Tr. 270, 299.  He was warehouse manager for six or seven years.  Tr. 270, 299.  Abraham recalled that, as such, he visited Preferred Fragrance's customers between 10 and 30 times, "[t]o make sure that I'm doing my job right, that I'm shipping the goods [ ] the way the buyer wants the goods." Tr. 271–72.  During these visits, Abraham met with personnel from at least three retail chains. Tr. 271.  Abraham also called buyers concerning, for example, special requests in the buyer's

---

[8] On January 24, 2014, the defendants moved to stay or dismiss this action in favor of the Brooklyn Action.  Dkt. 34–39.  The parties briefed the issue, *see* Dkt. 43–44, 47–48, and on February 26, 2014, the Court heard argument, Dkt. 56.  At the close of argument, the Court announced that it would not abstain from exercising jurisdiction.  *Id.*  The Court briefly set out its reasons for that ruling and stated that a formal decision setting out the Court's reasoning would follow shortly.  *Id.*  On March 6, 2014, the Court issued that decision.  Dkt. 58.  On April 2, 2014, the Honorable Carolyn E. Demarest, acting in recognition of this Court's decision to exercise jurisdiction, dismissed the Brooklyn Action "without prejudice to a motion to restore should the federal action not resolve all issues."  *Preferred Fragrance, Inc., et al. v. Fragrance Acquisitions, LLC, et al.*, Index No. 505426/2013, (N.Y. Sup. Ct.), Dkt. 67.

order.  Tr. 272.  Abraham spoke to most or all of Preferred Fragrance's major customers at some

point in time.  Tr. 272.  He also spoke with Ezriel about the buyers.[9]  Important here, Abraham

did not engage in sales.  Tr. 300.

In late 2011 or early 2012, Fragrance Acquisitions fired Abraham.  Tr. 283.  Abraham

then worked for a friend of his brother-in-law at Fine Line Setting, which sells upscale

disposable dishes.  Tr. 273, 303–04.  But Abraham's attempts to sell dishes for Fine Line did not

go well; he made sales to only three chain stores, Variety, Lot Less, and National Wholesale

Liquidators.  Tr. 274, 304, 327.  Each was a customer of Fragrance Acquisitions.  Tr. 304.  Ezriel

tried to help Abraham with his sales for Fine Lines by bringing Abraham to a retail show,

approaching buyers on Abraham's behalf, and flying with Abraham to meet with the tableware

buyer of one potential customer, Variety.  Tr. 304–06.

### D.  Ouleaf

#### 1.  Creation of Ouleaf and Ezriel's Knowledge

Ouleaf is a competitor of Fragrance Acquisitions.  Tr. 226, 274.  Abraham testified that

he came up with the idea for Ouleaf in early 2013.  Tr. 275.  He brought the idea to a woman he

knows as "Bella," who owns OnlyYou, a Chinese company that is Fragrance Acquisitions's

main supplier.[10]  Bella, he testified, was "really excited" about the idea and said she had had a

---

[9] Tr. 302–03 ("He told me that this buyer is more difficult, if something comes damaged then
you need to watch more.  This buyer she don't care so much.  So you can, you don't have to
watch so strong.  So basically what we talk it's about the buyers.").

[10] Tr. 55, 264, 274–276; *see* Tr. 275 ("Q.  How were you first introduced to Ouleaf?  A.  I
contact the Bella, the owner from OnlyYou and I bring up this idea for her to have a company in
the United States to sell perfumes.  Q.  So it was your idea to sell in the United States?  A.  Yes.
Q.  When you said you contacted Bella, did you do it alone with somebody else?  A.  Just me.").

similar idea. Tr. 275. According to Abraham, after a few more conversations, he and Bella

opened the company, with Bella as the owner, and they began doing business. Tr. 275.

As to what Ezriel knew of Ouleaf's founding, and when he knew it, the Polatseks gave

divergent testimony. Ezriel testified that, in the beginning, Abraham did not tell him that Ouleaf

was in the business of selling imitation perfumes, because, he believed, Abraham was concerned

about how Ezriel might react. Tr. 224–25. However, Ezriel testified, before he had been fired

from Fragrance Acquisitions in October 2013, Abraham told him about his work with Ouleaf,

what Ouleaf did, and that Ouleaf had been his idea. Tr. 224–25. Ezriel testified that he was not

upset that Abraham had opened a competing business. Tr. 226, 228. Ezriel also testified that he

was not involved in the creation of Ouleaf.[11]  Tr. 56.

Abraham testified, at his April 10, 2014 deposition, that Ezriel did not "find out about

Ouleaf" until early 2014, well after Ezriel had been fired and after Ouleaf had begun selling to

the customers of Fragrance Acquisitions:

> Q. At the time this invoice was done [on September 30, 2013] had you told your brother
> Ezriel that you were selling products to Rainbow?
>
> A. No.
>
> Q. Were you afraid that he was going to find out that you were in a business selling
> similar products to Preferred's customers when he was still the head of sales at Preferred?
>
> . . .
>
> A. Yes.
>
> . . .

---

[11] Ezriel also testified that both Exceed and Ouleaf had offices at 60 Rutledge Street in Brooklyn, and that he and Abraham ran into each other there once or twice. Tr. 149–51. Ezriel testified that, on those occasions, he asked Abraham, who lives about an hour and a half away in Monroe, NY, what Abraham was doing there, and Abraham replied that he was working for Ouleaf. Tr. 150–51. Ezriel testified, however, that at the time he did not know that Ouleaf had an office at 60 Rutledge. Tr. 150–51. This testimony was not credible.

> Q.  When to the best of your knowledge did [Ezriel] find out about Ouleaf? [ ]
>
> A.  About, I'm not remember.  Like a month ago, two months ago.  I'm not remember exactly when he find out.  He didn't find out from me.  That's the reason I don't know exactly when he find out.

Tr. 345–46 (quoting from deposition testimony).  At the hearing, however, Abraham testified, that he was not sure when he told Ezriel about his involvement with Ouleaf.  Tr. 345 ("Q.  Now, at the time of this invoice you still had not told Ezriel that you were in the business of selling similar products to Preferred's customers, have you?  A. I'm not sure when I told him.").

### 2.  Ouleaf's Sales

Ouleaf sells perfumes to 10 retail chains, each of which is or previously was a customer of Fragrance Acquisitions.  PX 47; Tr. 227–28, 343.  The parties dispute whether Ezriel assisted Abraham in connection with Ouleaf's sales.  Abraham testified that he alone was responsible for these sales and that he knew these companies from his time at Preferred Fragrance.  Tr. 276–77.  He testified that, in each case, he personally persuaded the retailer to buy Ouleaf's perfumes by calling the retailer's main phone line and asking to be put in touch with the perfume buyer.  Tr. 344.  Abraham testified that he never asked Ezriel to introduce him to potential customers of Ouleaf.  Tr. 348.  Ezriel similarly testified that he never made sales, helped Abraham make sales, or gave Abraham advice about making sales for Ouleaf.  Tr. 56–57.

### 3.  Ezriel's Pitch in Puerto Rico for Business on Behalf of Ouleaf

It is undisputed that Ezriel, on one occasion, pitched Ouleaf's fragrance business to a corporate customer of Preferred Fragrance.  This evidence came to light as a result of an affidavit from the customer's CEO, which plaintiffs submitted in this lawsuit.  Specifically, on January 14, 2014, Ezriel called Radames Tirado, the CEO of Chucherias, Inc. ("Chucherias"), a perfume

wholesaler in Puerto Rico, to introduce Tirado to Abraham and Ouleaf.  Steel Decl. Ex. FF

("Tirado Aff.") ¶ 3.  In his affidavit, Tirado recounts the call as follows:

> 2.  Chucherias is and has been a customer of the business I know as "Preferred Fragrance."  In connection with the dealings between Preferred Fragrance and Chucherias, I am acquainted with Ezriel Polatsek ("Ezriel").
>
> 3.  On January 14, 2014, I received a call from Ezriel Polatsek.  He said that he wanted to introduce me to a new fragrance company and that he wanted Chucherias to do business with this new company.
>
> 4.  He said that this was "confidential."
>
> . . .
>
> 7.  The next day, January 15, 2014, I received an e-mail from Abraham Polatsek ("Abraham"), on behalf of Ouleaf, soliciting business from Chucherias.  The subject line of Abraham's e-mail was "Ouleaf/Chucherias."  Abraham's e-mail attached a .pdf copy of the Ouleaf catalogue of products.
>
> 8.  The first line of Abraham's email referred to "the conversation you had yesterday in which my line was introduced to you . . . ."  That was clearly a reference to the conversation I had had the previous day with Ezriel.  I had not spoken (and never did speak) to anyone else on behalf of Ouleaf.
>
> 9.  I was not interested in doing business with Ouleaf and did not respond to Abraham's e-mail.  He called a few times after that, apparently to follow up, but I did not speak to him or return his calls.

*Id.* ¶¶ 2–9.

Ezriel, at the hearing, admitted this conduct.  He testified that he had called Tirado on

behalf of Ouleaf at Abraham's request.  Tr. 40–42, 247; *see* Tr. 247 ("Q.  And you did that so

that Abraham could sell Ouleaf products, correct?  A.  Yes.   Q.  And specifically your brother

had a line of perfumes that you wanted to introduce to the perfume buyer in Puerto Rico?  . . .

A.  Yes.").  Ezriel also admitted that he asked Tirado to keep the conversation confidential.[12]
Tr. 251.

Abraham, by contrast, denied this.  He testified that he had called Tirado himself, without
any help from Ezriel, and that he had no recollection of asking Ezriel to call Tirado.  Tr. 349–51.
The Court does not credit Abraham's testimony on this point.  It is inconsistent with Tirado's
affidavit and Ezriel's ensuing testimony.

Ezriel admitted that his call to Tirado was a violation of his non-compete agreements.
Tr. 40.  In what the Court understood to be an attempt to explain why this violation was a
singular event unlikely to recur, Ezriel testified that at the time he made the call, he believed that
his non-compete agreement did not apply to Puerto Rico:

> Q.  Since the conversation that you had with [Tirado], have you learned that there's
> an issue under your non-compete with regards to Puerto Rico?
>
> A.  After the[n], no.  Only when the affidavit comes up and I went to my lawyers
> and they read me – they told me actually that I cannot do in the entire world for five
> years, not compete.  So I didn't know from this.  Just explain a small thing for the
> judge, that when I have lawsuits before from copyright, like from Estee Lauder,
> like things looks too close and we have to make a deal to sell it outside of the
> country, was always Puerto Rico a place where I can sell it.
>
> THE COURT:  In other words, you were accused of copyright infringement before,
> and when you settled those cases, the settlement drew a geographic line between
> the continental United States on the one hand, where you were prohibited from
> doing what you were doing, and outside of it, where you were allowed to, is that
> right?

---

[12] Ezriel's testimony on the confidentiality point was inconsistent.  At the hearing, Ezriel
originally denied that he had asked Tirado to keep the conversation confidential.  Tr. 249 ("Q.
But instead you did tell Mr. Tirado that this conversation that you were having with him about
introducing Ouleaf products was confidential?  A.  No.  Q.  You didn't say that?  A.  No.").
Ezriel was then presented with his earlier, contrary deposition testimony.  Tr. 249.  He then
admitted that he *had* asked Tirado to keep the conversation confidential, stating that he had done
so to avoid conflict with the new owners of Preferred Fragrance.  Tr. 251 ("Q.  And you were
worried that the plaintiffs were going to be mad that you made that introduction, right?  A.
Yes.  Q.  And that's why you told Mr. Tirado that he should keep your conversation
confidential?  THE COURT:  I need a verbal answer.  A.  Yes.").

> THE WITNESS:  Right.  So I'm just trying to bring out that I'm not so dumb, but
> I didn't – when I say that I didn't know that Puerto Rico was a part of the US, I
> know it's a part of US, but I didn't think that my non-compete wasn't good.

Tr. 44; *see also* Tr. 40–41 ("I was very careful not to violate my non-compete.  It was one day,

what I remember that my brother ask me maybe I can help him some at least overseas, because I

was always on the understanding that my non-compete is only in the US. . . .  [S]o I told him, I

don't know too much people, and . . . he told me about Chucherias. . . .  I make a phone call, and

I told them that, I didn't speak to you for a long time.  My brother have a line of perfumes, and

he going to call you.  You should know who it is.  That's what I did.").  Ezriel testified that, at

the time, he did not check whether his non-compete agreement applied to Puerto Rico; instead,

he relied on his memory of it.  Tr. 248–49.

### 4.  Ezriel and Abraham's Visit to a Toronto Customer

On February 6, 2014, Ezriel and Abraham traveled to Toronto, together, so that they

could each meet with personnel at YM, a chain store.  Tr. 53–54, 62–64.  They testified that they

went for completely separate and independent purposes:  Abraham went, on behalf of Ouleaf, to

sell perfumes, whereas Ezriel went to meet with Mike Gold, a good friend and the owner of YM,

to discuss lines of business that Ezriel might be able to pursue that were outside the scope of his

non-compete prohibition.  Tr. 53.

This episode was the source of extended testimony at the hearing.  The parties disagree

about Ezriel's purpose in going to Toronto and, in particular, whether his claim to have gone

there independent of Abraham's prospecting trip for Ouleaf is credible.  The Court first sets out

Ezriel's and Abraham's initial flat denials about the joint trip to Toronto; then recounts their later

testimony, which reflected a changed version of events; and then sets out its factual conclusions.

### a.  The Polatseks' Initial Denials

The Polatseks flew on the same plane to Toronto, shared a taxi from the airport to YM's office, and then shared a taxi back to the airport.  Tr. 295, 297.  Initially, however, the Polatseks entirely denied that they had traveled to Toronto together.  At his deposition, strikingly, Ezriel testified that he had flown instead with Abe Katz, a 22-year-old business associate, *see infra*, and not his own brother, Abraham Polatsek.  Tr. 68–69.

Q.  Mr. Polatsek, at your deposition I asked you, did anyone go with you on that trip?  Do you see where it says that?

A.  Yes.

Q.  And we were talking about the trip to Toronto, right?

A.  Yes.

Q.  And you said, if anyone go with me, Abe Katz, yes. Do you remember being asked that question and giving that answer?

A.  Yes.

Q.  And then to make sure, I then asked, was that it? And you answered, yes, this is what I remember.  Do you remember those questions and answers?

A.  Yes.

. . .

THE COURT:  Sorry.  Wait a minute.  Let me understand this.  At your deposition, when you were asked, did anyone go with you on that trip, the truthful answer was your brother, correct?

THE WITNESS:  Right, but –

THE COURT:  Whoa.  And you did not mention your brother, correct?

THE WITNESS:  Correct.

THE COURT:  At the time of your deposition, did you remember that your brother had gone with you on that trip?

THE WITNESS:  Yes.

THE COURT:  Why did you not mention your brother when you were asked the question whether anyone went with you on the trip?

THE WITNESS:  Because it was a lot of Abes, and my answer to Abe Polatsek, and I just make a mistake to this answer, Abe Katz.

THE COURT:  Thank you.

Tr. 68–69.  The Court finds Ezriel's explanation for his false statement at his deposition—that he had accidentally confused his own brother with a business associate—wholly incredible.

Ezriel also initially testified that he had never talked about YM with Abraham.  Tr. 69–70 (citing deposition testimony).  He later retracted that testimony, too.  Tr. 70 ("On the deposition it was true because I don't remember anything speaking to my brother about YM.  After the deposition, and I went over it, and so I think maybe it's not truthful to say 100 percent I never spoke to him about YM.").  In fact, Abraham and Ezriel had spoken about YM so as to coordinate their trip to Toronto.  Tr. 71 ("Q.  In fact, as you just testified a few minutes ago, you had spoken to your brother Abraham about YM because you needed to coordinate a trip to YM because you were both going there to meet with different people, right?  A.  Yes.").

Like Ezriel, Abraham also initially denied that he and Ezriel had traveled to Toronto together.  Tr. 292–94.

Q.  Okay.  I'd like you to turn to your deposition to page 224, lines 16 to 18.

"Q. . . .  Did you ever travel to Toronto?

A.  Yes.

Q.  You did.  Okay?

A.  To meet YM.

Q.  When was that?

> A.  A while ago, like two months ago.  I'm not remember exactly.
>
> Q.  Did you travel there with anyone?
>
> A.  No."

Were you asked those questions and did you give those answers?

A.  Yes.

Q.  And the next question:

> "Q.  Did you travel there with Ezriel?
>
> A.  No."

Were you asked that question and did you give that answer?

A.  Yes.

Q.  And that was incorrect, wasn't it?

A.  My understanding was different than now.

THE COURT:  I'm sorry, your understanding of what was different?

THE WITNESS:  My understanding was, the whole deposition he asked me so many questions if I went with Ezriel to buyers, to perfume buyers, and that was my understanding.  If he came to YM to perfume buyers and the answer was no.

THE COURT:  When you were asked this question, "Did you travel there with anybody," and your answer was no, and then you were asked, "Did you travel there with Ezriel," and your answer was no, did you understand there it was referring to Toronto?

THE WITNESS:  There was a lot of people on the plane a lot of people were traveling.  My whole understanding was he asked he so many times did I travel –

THE COURT:  I'm asking you, when he asked you the question did you understand he was asking you about the trip to Toronto?

THE WITNESS:  No.

THE COURT:  What did you understand the question to refer to, "Did you travel there with anybody?"

19

THE WITNESS:  If I went to the buyer there with anybody.

THE COURT:  So you understood the word "there" to refer to YM?

THE WITNESS:  Yes.

Tr. 292–94.

The Court finds Abraham's explanation that he had understood the questions at his deposition to refer to his travel to YM, not Toronto, also not credible.  The question "Did you ever travel to Toronto?" preceded the questions "Did you travel there with anybody?" and "Did you travel there with Ezriel?"  These latter questions were clearly, and unavoidably, about travel to Toronto.  And even if those questions referred to travel to YM, Abraham's answer that he and Ezriel did not travel together would also have been false, because, as Abraham later admitted at the hearing, he and Ezriel took a taxi from the airport to YM together.  Tr. 295 ("THE COURT: Wait a minute.  Let me just ask you a question.  When you told me a moment ago that you understood the deposition question "did you travel there with anybody" and you answered no to refer to YM, that statement in the deposition was not accurate, correct?  Because you traveled there with Ezriel by taxi.  THE WITNESS:  Right.  THE COURT:  Thank you.  THE WITNESS: My understanding was a different thing.").

At his deposition, Abraham also initially denied knowing about Ezriel's meeting with YM.  *See* Tr. 296 (reading from deposition testimony: "'Q.  Do you know if Ezriel was meeting with YM at the same time?  A.  No.  Q.  He was not?  A.  I don't know.  You asked me if I know. I don't know.'").  Abraham later tried to explain that he had answered in the negative because "I don't know if it was the same time that I was there.  I was there the whole day.  I don't know what time he met Mike Gold."  Tr. 296–97.  This explanation is also incredible.  Abraham knew

that he and Ezriel were at YM at the same time, because, as he later admitted, they arrived together and left together.  Tr. 294–97.

Finally, Abraham initially denied knowing whether Ezriel "was in Toronto on the same week" that Abraham was there.  Tr. 298.  His attempted explanation was that "I was there only one day. I wasn't there the whole week. I don't know if he was there the whole week."  Tr. 298.  This explanation also lacks credibility:  Abraham later admitted that he and Ezriel had traveled both to and from Toronto together.  Tr. 294–97.

### b.  The Polatseks' Revised Version of Events

At the hearing before the Court, the Polatseks retreated from their initial claim to have traveled to Toronto independently, while insisting that Ezriel had had no role in Abraham's attempt to arrange fragrance business with YM for Ouleaf.

Ezriel testified that he arranged to travel to Toronto to meet with Mike Gold, the owner of YM and a "very close friend," about lines of business that he, Ezriel, could pursue without violating his non-compete agreement.  Tr. 54 ("Q.  Can you tell us the reason why you went to see Mr. Gold?  A.  Mr. Gold told me they've a lot of ideas where I can do while I'm not doing perfumes, so will give me a lot of accessories, toys, what could fit in every stores.  And I should go look around and he's going to buy [from] me.").  Ezriel testified that, a few days before he was scheduled to travel to Toronto, Abraham called him and told him that he wanted to make an appointment with a perfume buyer at YM.  Tr. 123–124.  Ezriel and Abraham then booked tickets on the same flight.  Tr. 124 ("THE COURT:  When you made your plane reservation to Toronto, did you know you were going to be on the same flight as your brother? [Ezriel]:  Yes.").

21

Abraham testified that he had been selling Ouleaf perfumes to YM for about six or seven months before his trip to Toronto on February 6, 2014.  Tr. 280.  The purpose of his trip to Toronto, he stated, was to visit a YM buyer named Christina.  Tr. 280.  Abraham explained that YM has multiple chains, with different perfume buyers for each chain, and that before his trip to Toronto on February 6, 2014, he had sold Ouleaf perfumes to some chains, but not the chain for which Christina purchased perfumes.  Tr. 289–90.  Abraham testified that he had an appointment with Christina, but that when he arrived, Christina sent her assistant, Jiliana, to meet with him. Tr. 281.  The meeting took place in the lunchroom and lasted about five minutes, during which time Abraham gave Jiliana perfume samples and information about Ouleaf's perfumes.  Tr. 281–82.  Abraham testified that Ezriel was not part of the meeting.  Tr. 282.

Once in Toronto, Ezriel testified, he met with Gold, who asked him what he planned to do now that he was no longer with Preferred Fragrance.  Tr. 67 ("[Gold] asked me what my plan is to do, and I told him I cannot do perfumes.  What business he can give me without perfumes? No clothing, anything but.  Accessories, other stuff.").  Ezriel testified that he did not participate in Abraham's meeting or talk with anybody about perfumes, except that "Mike Gold asked me if I'm doing – continue to do perfume on my own.  And I told Mike that I cannot do it because I have a non-compete, and I really appreciate if he can help me out with other things what I can do."  Tr. 54.  Ezriel also testified that he did not say anything to Gold on Abraham's behalf. Tr. 67.  Indeed, Ezriel testified that, to his surprise, Abraham had never asked him to help make sales to YM.  Tr. 66 ("I don't know why he never asked me his help for YM, and he didn't want YM for a long time.  So I never introduced him, and I was never asked I should help him anything at YM.").

On February 11, 2014, five days after the meetings in Toronto, Abraham sent Christina and Jiliana an email entitled "Ouleaf Inc. – Meeting follow up."[13]  PX 52 at 6; *see also* Tr. 287–88.  On February 20, 2014, Christina sent Abraham an email placing an order for 300 units each of three different perfumes.  PX 52 at 5.

Ezriel testified that his meeting with Gold did not yield any business, which he attributed to the shadow cast by this litigation.  Tr. 54 ("Q.  Did he ever buy for you?  A.  No.  Q.  Do you have any idea why?  A.  He didn't come to the phone lately.  My feeling is like everybody, like everybody is – everybody scares in this day from me.").

In sum, the Polatseks ultimately acknowledged that—contrary to their earlier claims— Ezriel and Abraham did travel both to and from Toronto, and to and from YM, together, but that Ezriel engaged in no conduct related to perfumes.  Their business there, they asserted in their hearing testimony, was completely independent.

### c.  The Court's Findings

Viewed in light of the Polatseks' original complete denial of a joint trip to Toronto, the Polatseks' revised claim that their trip together to a fragrance customer there was free of any effort by Ezriel to further Abraham and Ouleaf's fragrance business is not credible.  The Polatseks' original, flagrantly false testimony, is vital context.  There is no benign explanation for this false testimony.[14]  The Court must conclude that the Polatseks had something to hide—

---

[13] Abraham testified that his wife helps him compose his emails, or composes them herself, because English is his second language.  Tr. 279; *see also* Tr. 317, 352.

[14] Conceivably Ezriel felt justified in competing with Fragrance Acquisitions based on the new owners' treatment of him and his staff, or breaches that he perceived on their part.  But that is no justification for disregard of his oath to testify truthfully.  And Ezriel did not defend against the motion for a preliminary injunction on the grounds that he was justified in assisting Fragrance Acquisitions' competition.  Instead, he flatly denied any such conduct.

and that Ezriel's trip to Toronto was aimed at least in part to help Abraham sell Ouleaf perfumes to YM, much as Ezriel's call to Radames Tirado was directed at helping Abraham sell Ouleaf perfumes to Chucherias.  Precisely the form of such assistance is elusive on the present record—including whether Ezriel reached out to YM to arrange Abraham's meeting knowing what its purpose would be, and whether Ezriel met with YM's fragrance buyer.  Conceivably merits discovery will illuminate this point.  But the inference is unavoidable, and the Court easily finds, that the trip bespeaks assistance by Ezriel—prohibited by his non-compete agreements—in Abraham's fragrance business.  Notably, Ezriel had previously provided similar assistance to Abraham—introducing Abraham to customers, and flying to visit one with Abraham—in connection with Abraham's work for Fine Line Settings.

The Court further notes that the evidence as to the Toronto trip badly undermines Ezriel's benign account of his call to the Puerto Rico fragrance buyer, Tirado, of Chucherias.  Had Ezriel truly believed that the geographic scope of his non-compete was limited so as to exclude Puerto Rico (whether to the continental United States, the 50 U.S. states, or otherwise), it follows that he would likewise have believed that he was free to participate in the fragrance business in a city in a foreign country, like Toronto.  There would have been no need for Ezriel, or Abraham, to take pains, including giving false testimony, to conceal their joint trip to YM there.  That the Polatseks did so, the Court finds, reveals that Ezriel did not believe that the geographic scope of his non-compete agreements were thus limited.  On the contrary, his insistence to Tirado that their discussion be kept confidential is classic "consciousness of guilt" evidence.  The Court finds that it reflects Ezriel's recognition that his attempt to drum up fragrance business in Puerto Rico for Ouleaf was a violation of the non-compete agreements.

Separately, at the hearing, plaintiffs introduced evidence of repeated phone calls by Ezriel to two chain store buyers after he was fired by Fragrance Acquisitions.  Tr. 57–59, 232–41; PX 60 (showing 24 calls to Joanne Spivey, the perfume buyer for Dollar General, between January 27 and February 12, 2014; of those calls, 23 lasted one minute and one lasted five minutes).  Plaintiffs suggested that these calls, too, were in the service of a competing fragrance business, perhaps Ouleaf.  On the sparse present record, the Court cannot so find.  It is, of course entirely possible that that the purpose of these calls was to promote Ouleaf's fragrance business.  Merits discovery, including testimony or documentary evidence from the recipients of these calls, may shed light on their purpose.  However, absent any other evidence as to the purpose of these calls, the conclusion that these calls bespoke efforts by Ezriel in breach of his non-compete agreements would require undue speculation.  Ezriel explained these calls as efforts to keep in touch with his professional contacts and friends, *see* Tr. 58–59, 233, 235.  That claim is not inherently implausible, although, of course, neither is plaintiffs' thesis that Ezriel, with his relationship with Preferred Fragrance on the rocks, broadly embarked on a plan to carry on a fragrance business by other means, including through his younger brother Abraham.  The Court reserves judgment on these claims, and does not rely, for the purposes of the instant motion, on the evidence of Ezriel's phone calls to fragrance buyers other than Tirado of Chucherias.

### E.  Ezriel's Activities on Behalf of Exceed

#### 1.  Abe Katz and the Creation of Exceed

Abe Katz is the son of Ezriel's former right-hand saleswoman at Fragrance Acquisitions, Fay Werner.  Tr. 32–33.  Ezriel has known Katz since Katz was age 13.  Tr. 33 ("Abe Katz comes a lot of times to the office because his mom is single, and he's always with his mom. . . . I know him since the Bar Mitzvah.").

In late spring or early summer of 2013, when Katz was about age 20, he returned from Israel, and Glenn Palmer hired him to work at Fragrance Acquisitions, where he worked for about a month. Tr. 34. Ezriel testified that, during that time, Katz got in an argument with his mother about whether he should go to college. Tr. 33. Ezriel testified that he told Katz that he, Katz, was a terrific salesman, and that college was not for him—instead, he told Katz to open up a business, and that Ezriel would help him, although, because of the non-compete agreements, not with fragrance work.[15]

Ezriel testified that he began introducing Katz to potential buyers in April or May 2013. Tr. 113. On June 12, 2013, Katz formed Exceed, a marketing company that would leverage Ezriel's relationships to sell products to chain stores. PX 34; Tr. 35, 87. Ezriel testified that it was a coincidence that Exceed was born around the time that his relationship with Fragrance Acquisitions was spiraling downward. Rather, Ezriel explained, the timing had to do with Katz's return from Israel. Tr. 112–13.

Ezriel testified that he was never an owner, member, or shareholder of Exceed. Tr. 36. However, a document produced by Exceed and dated August 19, 2013, is to the contrary. It states that, at the time of Exceed's formation on June 12, 2013, "Ezriel Polatsek" was Exceed's

---

[15] See Tr. 33–34 ("Go around looking for closeouts. If you have something, go and we'll try to queue up with people what you can do. . . . I told him, go open just LLC, and you can start going out, and I will really help you, whatever. And his mom really wanted – the kid should not be in the street, so I cannot bring him in."); Tr. 34 ("I told him I know people from toys, in the toy industry. I know people in candles. I know people in vitamins, and food. I have friends where they have businesses, and I told him, go to my friends and tell them that you want to take a shot."); Tr. 34–35 ("THE COURT: So you spoke to him about toys, candles, vitamins and food. Why did you not talk to him about fragrances? THE WITNESS: Because he cannot sell fragrances. Fragrances is – whatever connection it's possible, I sell fragrances. So just him for hire to me to be a salesman for fragrances, I really don't need him. I have his mom. It's not something he can bring me new connections. The idea is he can come to existing stores with other lines.").

sole member/manager.  PX 34.  That document also sets forth Ezriel's address, Social Security

Number, and month and date of birth (albeit reciting the present year, incorrectly, as Ezriel's

year of birth).  *Id.*; Tr. 131–32.  At the hearing, Ezriel denied any knowledge of the document or

its contents:

> Q.  Did you ask Abe Katz to prepare a document or to work with a lawyer that
> would make clear that you were the owner or member or manager of Exceed LLC?
>
> A.  No.
>
> Q.  Did Abe Katz ever tell you that he had decided that you should be the sole
> member and manager of Exceed LLC, and therefore had created the document to
> effect that?
>
> A.  No, I still as of today don't know what is a sole member or manager.  He open
> LLC and told me he need to have some information from me, but [ ]till I saw this
> document, I didn't know that I was the member or the manager of Exceed.
>
> Q.  And in August of 2013 who did you think was the owner of Exceed?
>
> A.  Abe Katz.

Tr. 133.

## 2.  Ezriel's Involvement with Exceed While at Fragrance Acquisitions

Ezriel initially testified that, in Exceed's early months, while Ezriel was still working at

Fragrance Acquisitions, he merely advised Katz and made introductions for him.[16]  The

---

[16] *See* Tr. 36 ("Q.  Before you were fired, did you do any business for Exceed?  A.  No.  Q.  With
Exceed?  A.  No.  I give him introductions, but meaning I – I told him let's say that I can make a
phone call to . . . a chain store and told somebody going to come down to you, just give him an
appointment, see what he have to sell.  Like I help him to get introductions, but it's not
something what I was involved.");  Tr. 86–87 ("Q.  And the idea was that somehow the two of
you were going to team up and you were going to mentor him and have a sales company, right?
A.  No.  In the beginning . . . was not the plan that I was going to work with him because I was
working in Preferred Fragrance at this time.  After I left, I teamed up with him.  Before I just
gave him ideas, a few things to help him.  Q.  But you weren't actually doing anything to help
him?  A.  Nothing.");  Tr. 91 ("Q.  But before you left Preferred Fragrance, you were not really
doing anything substantively to help him except making some introductions?  A.  Correct.").

documentary evidence adduced at the hearing, however, indicates that Ezriel's initial role for Exceed was far more than merely passive.

On May 20, 2013, Katz sent an email to, among others, Cindy Lozada and Laura Cipolat, buyers for a chain store named "dd's Discounts" ("dd's"), which was a customer of Fragrance Acquisitions. PX 53; Tr. 91. Ezriel had introduced Katz to dd's. Tr. 91–92. In the email, Katz stated that he was attaching a document showing "the products that you have picked out from Creative Kid's show room." PX 53. He added: "as you know, myself and Ezriel are here to work with you and make this and future orders happen." *Id.* At the hearing, however, Ezriel denied that he had had any role in a Creative Kids order from dd's. Tr. 97.

On June 14, 2013, Katz sent an email to Cipolat. Katz wrote, "Ezriel has asked if you can try and take deeper quantities and he would do his best to get the prices lower." PX 54 at 2. Ezriel, however, again denied knowledge of these events. He testified that Katz used his name "because he knows that I have a relation with these people. But I never talk about prices, quantity." Tr. 100.

On July 4, 2013, Katz sent another email to Lozada entitled "Recap on Meeting." The email began, "[f]irst off it was great seeing you yesterday and thank you for having Ezriel and I at the office." PX 57. The email also referred to "the mega bead set which we were at twelve and then you wanted $8." *Id.* In his hearing testimony, Ezriel allowed that it "could be" that he was at the meeting; and that price and quantity of beads were discussed. However, he testified, if so, he did not personally discuss price and quantity; rather, he just sat by, passively, while Lozada and Katz did the negotiating. Tr. 108–09.

On July 15, 2013, Cipolat emailed Katz, attaching an order and adding "[a]pologize to Ezriel for me – I do not have his email to send over the order to him." PX 55. At the hearing,

Ezriel had a benign explanation for this email, too: "Because I called her so many times, she give a purchase order to help Abe Katz. So she probably want to show me that I did what you want and I send him a note." Tr. 103; *see also id.* ("Q. So, Mr. Polatsek, we've gone from you did absolutely nothing but introduce Mr. Katz to now you're calling repeatedly to ask for purchase orders, is that correct? A. Yes. . . . What I remember.").

On July 26, 2013, Lozada wrote, apparently to Katz, "[t]hanks don't forget to get me the indemnification from Ezriel." PX 56. Katz replied, "[n]ot a problem just Ezriel is on business out of state so the second he gets back it'll be taken care of." *Id.* At the hearing, Ezriel testified that he did not know the meaning of the word "indemnification" and had "[n]o idea" about this email. Tr. 104–05.

Separately, Ezriel also testified that, in July 2013, he went to Florida to meet with a perfume buyer on behalf of Fragrance Acquisitions and brought Katz along in order to introduce him to a toy buyer. Tr. 109–110.

The Court does not credit Ezriel's explanations, which are repudiated by the assembled documentary evidence. They reflect a facile and unconvincing attempt to explain away emails that show active involvement by him on behalf of Exceed. These emails demonstrate that, in summer 2013, Ezriel made substantial efforts on behalf of Exceed to generate business, at a time that he was still employed at Fragrance Acquisitions. It is, further, logical that Ezriel would engage in such efforts—Katz's prior background, like Abraham's, would ill qualify him to forge a successful such business on his own. To be sure, the emails do not establish, on their faces, that any of Ezriel's summer 2013 conduct involved selling perfumes. Ezriel's repeated attempts to understate his involvement with Exceed, however, raise very substantial questions about whether his efforts on behalf of Exceed involved selling fragrances.

### 3.   Ezriel's Involvement with Exceed After Fragrance Acquisitions

By his own admission, after Ezriel was fired by Preferred Fragrance, he became more

involved with Exceed:

> Q.   When you left Preferred, what kind of work did you do?
>
> A.   I don't do any work.  I'm looking what – the first few months I didn't do nothing.
> I looking around what to do.  I tried to hang out with somebody opens a company,
> Abe Katz.  And I tried to maybe be partners with him.  He should be mine, because
> I always need a secretary to read my e-mails, send my e-mails there with me.  So I
> was with him together for a few months, travelling, going, looking around what we
> can develop; meetings, lunches, dinners with buyers, asking their advice as to other
> things is best for me to do.
>
> . . .
>
> Abe Katz is Exceed.  Exceed is only one guy.  It's Abe Katz.  And I start going
> with him to appointments to toy buyers, to Big Lots, for vitamins.  I make a sale in
> vitamins, I make a sale in Big Lots for food, certain things like this.  But since I see
> that something – this could build into a company, Abe Katz needs salary and we
> need to start taking our offers.  We need to have expenses.  I don't have money to
> fund it.  So I ask my – I have a friend who do real estate, and I told them that they
> should fund the company and to give me opportunity to develop something for the
> company.  Once I develop something, I will be a partner in it.

Tr. 32, 38.  Ezriel denied, however, that his work with Exceed involved selling fragrances.

Tr. 36–37.  As the ensuing section reflects, that denial is belied by the evidence.

### 4.   Ezriel's Involvement in the Wilhelmina Venture

Wilhelmina is a modeling agency.  Tr. 46.  Ezriel testified that, while he was still

working at Fragrance Acquisitions, a friend of his, Abe Indig, who owns a skincare website,

Makari, approached him about a business opportunity related to Wilhelmina.  Tr. 46.  Indig was

in talks with Wilhelmina to license the Wilhelmina name to sell health and beauty products;

Indig wanted to know whether Fragrance Acquisitions would be interested in supplying

perfumes to be sold under the Wilhelmina brand in drug stores and other mass stores.  Tr. 46,

158–59.  Ezriel testified that he was excited about the idea and pitched it to Palmer, but Palmer

was not interested, because he did not believe that Wilhelmina was a recognizable brand.  Tr. 48.

During Ezriel's remaining time at Fragrance Acquisitions, Indig continued to pitch the idea,

insisting that he could get a good deal on the license; however, Fragrance Acquisitions did not

bite.  Tr. 48.  Ezriel attended at least one meeting about Wilhelmina while at Fragrance

Acquisitions, in late August 2013.  Tr. 159.

Ezriel was also involved with Wilhelmina after he was fired by Fragrance Acquisitions.

He testified that this post-firing involvement concerned only cosmetics, not perfumes, and

therefore did not violate the non-compete agreement.  The evidence, however, clearly establishes

that Ezriel's post-termination work with Wilhelmina concerned perfumes.

Ezriel testified that, after Fragrance Acquisitions fired him, his first idea for new work

was to go into cosmetics.  Tr. 48–49.  Ezriel "want[ed] to make a new concept in the cosmetic

line" in which, instead of the packaging being all black, it would have drawings of models; he

thought that Wilhelmina could be a good fit for this concept.  Tr. 48–49, 51.  As a result, Ezriel

testified, he asked Katz to look into whether Wilhelmina was willing to sell a license for

cosmetics.  Ezriel testified that he, on behalf of Exceed, ultimately reached a preliminary

understanding with Makari, as the licensee of Wilhelmina, to distribute cosmetics under the

Wilhelmina name.  Tr. 160–66; Ezriel Decl. I ¶¶ 19–20.

Ezriel initially testified that he did not do any work on packaging for Wilhelmina-

branded perfumes after he was fired by Fragrance Acquisitions.  Tr. 166–67.  However, on cross-

examination, Ezriel admitted that he did comment on the perfume gift sets shown in Plaintiffs'

Exhibit 16.

> Q.  And the title for it seems to be "Sweet Elegance" written in script above the
> bottle in the middle.  So Mr. Polatsek, this is a picture of what the packaging for a
> perfume gift set would look like, correct?

A.  No.

Q.  Well, in this picture the long skinny bottle on the side, that's a picture of what would be called a perfume roller, correct?

A.  Yes.

Q.  And perfume roller is basically a stick with a roller ball that you use to apply perfume, correct?

A.  Yes.

Q.  And the bottle in the middle, that's a picture of a bottle of perfume, correct?

A.  Yes.

Q.  And you gave comments on this picture?

A.  I gave comments. This we tried to establish – and I explained, if I can explain.

Q.  I was hoping for yes or no on that.

THE COURT:  Did you give comments on the picture of the woman on the bottle of perfume or the perfume roller?

THE WITNESS:  Yes.

THE COURT:  Next question.

Q.  Thank you.  And if you flip two more pages to a similar picture, that says "Be Glamorous" in script in the middle? . . .  This also was to be packaging that was going to be part of the Wilhelmina line, correct?

A.  Yes.

Q.  And once again the long, skinny bottle pictured here would be a perfume roller?

A.  Yes.

Q.  And once again, the bottle in the middle would be a perfume bottle?

A.  Yes.

Q.  And you gave comments on that as well?

A.  Only on the picture.

Q.  Right.

THE COURT:   Can you give us an approximate date as to when you gave comments on these two things?

THE WITNESS:  This was after I'm fired from Preferred, but –

Tr. 170–72.

On December 4, 2013, Ezra Aini of Makari sent an email entitled "CONFERENCE CALL[ ] – Wilhelmina" to Katz, Indig, Anna Urban of QNY Creative, and someone named "Jon B."  PX 15 at 2–3.  Aini asked, "Guys what time is good for everyone to have a conference call regarding the artwork?"  *Id.* at 3.  Aini's initial email appeared to have attached the artwork for a potential Wilhelmina product: his email attached a file named "image001.jpg."  *Id.*  The next morning, Katz wrote, "Hi Guys, Glad to see illustration came out beautifully.  Unfortunately [I] don't think Ezriel will be able to make the conference call, we will be out of the country the whole next week.  We can try and aim for sometime today but [I'm] not so sure of what his schedule is."  *Id.* at 2.

Later on the morning of December 5, 2013, Katz shared Ezriel's comments by email:[17]

I understand, I'm not completely sure Ezriel can be on the phone either[.]  From my perspective after talking to him he had a few comments to make. 1) [H]e wanted it to say www.wilhelmina.com on the bottle/box[.]
2) He loved the illustrations and we have been to multiple buyers already showing the designs too… (only great feedback)[.]
3) Now deciding of everyone in this group, myself and Ezriel feel that the way to proceed is not to go to China and have them make samples, especially when if we make a sample there it[']ll take a few weeks including the grave chance of dis-coloration from [C]hina or even them messing up on the illustration of the girls on the bottle.  We should do mock up's here which I'm sure you can recommend a good place.  Once we have a good place here let's get quotes and have this to show to the buyers in Mass [sic] as our launch for 2014 Wilhelmina.

---

[17] Ezriel testified that he does not personally read or send his emails; rather, he has an assistant, such as Katz, do it for him.  Tr. 32, 85, 93.  However, Ezriel's emails, even if handled on his behalf by an assistant, are ones for which he is nevertheless accountable.

This is what Ezriel will say on the phone, if any of you would like to individually call him and work from there that is okay too.

*Id.* at 1–2; *see also* Tr. 182 (confirming that Ezriel had a conversation with Katz about those comments). On December 9, 2013, at 6:44 p.m., Urban wrote to Katz, "Hi Abe can you get us sample bottles for the project we need for the comp house." PX 15 at 1.

Ezriel testified that the email from Katz mistakenly referred to bottles when it should have referred to a box for cosmetics. Tr. 182–184. That self-serving testimony is not credible. Katz's emails contains two references to "bottle," and the reference to "sample bottles" in Urban's email, and the evidence discussed *infra*, further undermine Ezriel's claim that Katz's email about perfume bottles was mistaken. *See also* Tr. 182 ("Q. Was there some discussion in connection with the Wilhelmina venture about putting cosmetics into a bottle? A. No.").

On December 9, 2013, at 6 p.m., Linda Hillebrand of QNY Creative sent Indig, Katz, Aini, and Jon B. an email with designs for four Wilhelmina-branded perfume gift sets. PX 16; *see also* PX 21 at 4 (showing that Linda Hillebrand worked for QNY Creative); Tr. 172. Each design had a drawing of a model's face on a perfume bottle and a perfume roller, along with the words "EAU DE PARFUME SPRAY" and "EAU DE TOILETTE SPRAY." PX 16; Tr. 170–71, 177–178.

Ezriel testified that he had shown the designs to buyers, as Katz mentioned in his email dated December 5, 2013, but that what he showed was a plastic box containing cosmetics and lipstick, rather than a perfume bottle and a perfume roller, and that he had somehow placed the drawings on the box and cosmetics. Tr. 172–73, 176–177. That testimony is also not credible. In any case, Ezriel elsewhere admitted working to further the packaging of Wilhelmina's perfume products. Specifically, he admitted that, even if the drawings had been placed on

34

containers of cosmetics rather than perfumes, they contained the words "Eau de Parfume Spray" and "Eau de Toilette Spray," which he knew referred to fragrance products.  Tr. 177–79; *see also* Tr. 179  ("Q.  "So did you understand at the time you were commenting on these designs that you were commenting on designs that had some connection to a fragrance product?  A.  Yes.").

On December 10, 2013, at 7:20 p.m., Katz emailed, "I have received the quotes for the comps.  If everyone is ready to go along with it as well, Ezriel thinks it's a great price and definitely worthwhile for future.  Anna, what is ETA for the comps if we go ahead with this?"  PX 21 at 2.  A few minutes later, Urban responded, "Hi Abe, Yes it is this is a friend price for the agency.  James will deliver eta's tomorrow.  Abe you will supply the glass stock bottles just to confirm."  *Id.*  The next morning, James Ferranti of QNY Creative replied, "Hello all, ETA on comps are 1 week from receiving the glass stock bottles."  *Id.* at 1.  On December 16, 2013, Indig asked, "Any updates?"  *Id.*  The next morning, Urban responded, "We need the glass bottles to move forward and the payment."  *Id.*  An hour later, Ferranti emailed the group an invoice for the comps, which described the products as "Custom print and assemble (5) acetate set boxes with (5) Acetate Platforms with wells to hold 2 products each / Custom print and assemble (5) perfume bottles and (5) Roll on perfume bottles with 4/color graphics."  PX 20 at 2.  Early that afternoon, Indig replied, "I hope to have bottles and payment tom[orrow]."  PX 21 at 1.[18]

---

[18] At the hearing, when Ezriel was confronted with this email chain, he testified that he had discussed comparables with Katz; the comps he had discussed were for a cosmetics box, not perfume packaging; that he did not discuss providing glass stock bottles for the Wilhelmina venture; and that he was not aware of any comps that were made for Wilhelmina perfume bottles.  Tr. 188–89, 194.  In light of the overall evidence reflecting his involvement in the perfume-related aspects of the Wilhelmina venture, and in light of Ezriel's pattern of credibility-defying denials, the Court rejects this testimony, too, as incredible.

On January 21, 2014, Jeff Georgino of Wilhelmina emailed, "Hi guys.  When do you want to schedule our next meeting?  You mentioned last time that you may want to sample some fragrances and have models doing it and capture that on video for content to be used later.  Let me know.  Thanks."  PX 22 at 8.  From January 21 to February 4, 2014, Indig, Ferranti, and Aini corresponded about when the "samples" would be in.  *Id.* at 5–8.  Then, on February 20, 2014, the following emails were sent:

> Ezra Aini: Hey James[,] When are we getting the single perfumes?
>
> James Ferranti:  Hey Ezra, [n]ot sure what you mean by that?  What you have is all I was aware of.  Please let me know.
>
> Ezra Aini: We got the gift sets.  But we also have the fragrance in the box, single sets.  Where are those samples?
>
> Anna Urban:  Hi Ezra, [t]he gift sets were the job.  We were instructed that the single boxes were not needed as they were never going to hit stores.  This was contradictory from the first instructions that did not include gifts sets or rollers so we swa[p]ped them out.
>
> Ezra Aini: Abe see below is this true?  Avrumy?  Ezriel?  What do you think[?]
>
> Abe Katz:  NEXT THURSDAY AT 3PM I CAN SCHEDULE A MEETING WITH EZRIEL TO COME DOWN.  IS THAT OK?

*Id.* at 3–5.  After some emails about scheduling, the group agreed to meet on Friday, February 28, 2014, at 10:30 a.m.  *Id.* at 2–3.  Indig then asked Ezra to send out a calendar invite, which led to the following emails:

> Ezra Aini:  With fragrance company too?  Shawna please send out invites for our office for next week Friday at 10:30.  Jeff, please attend as we will like to get final approvals.
>
> Jeff Georgino:  Do you want to come to our office?  We can do a "focus group" with some of the young models to see what they think.  You guys can also take a look around the agency and get a feel of things and maybe some inspiration for marketing.  Let me know?
>
> Ezra Aini:  Yes we should.  What's your address?

Jeff Georgino:  300 Park Avenue South[,] Floor 2[,] New York, NY 10010[.]

*Id.* at 1.  Significantly, this last email was sent to a group that included Ezriel and Katz.  *Id.*

On February 28, 2014, Ezriel, by his own admission, attended the meeting at Wilhelmina's office.  Tr. 196.  Katz, Indig, and "a bunch of people from Wilhelmina" attended. Tr. 50.  Ezriel described the meeting as follows:

> Q.  So this meeting came about because you needed, you, Ezriel Polatsek, needed to review those designs, is that correct?
>
> A.  For cosmetics, I needed to review it, yes.
>
> Q.  And that was the purpose of the meeting?
>
> A.  Yes.
>
> . . .
>
> THE WITNESS:  The meeting was to cover whether the Wilhelmina models – like they have to give an okay if they like the drawings, because each drawing represent another model.  So they called down the live models and show the pictures of the drawings, and all the models have to give their opinion about the face, if they like it or not.
>
> . . .
>
> Q.  And the drawings were the same drawings we were looking at of the perfume gift sets, correct?
>
> A.  Yes, but not to represent the perfume gift set, just big board drawing of models.
>
> . . .
>
> Q.  But what there was was a picture of packaging that would contain one perfume roller and one bottle of perfume?
>
> A.  Yes.
>
> Q.  And that's what you gave your comments on, is that correct?
>
> A.  Yes.

Q.  Now during that meeting you also discussed the models, the designs, marketing and stores, correct?

A.  Yes.

Q.   And with respect to the marketing, you discussed specific things about the model illustrations and whether or not to have a particular model smile or look angry and whether to put www.wilhelmina on the package, right?

A.  Yes.

Q.  And with respect to stor[es], you discussed mass drug stores and mass discounters, right?

A.  Yes.

Q.  And now you said you did make comments on those packages, and that that was reflected in documents, right?

A.  Yes.

Tr. 210–12.  At the meeting, Ezriel made comments such as "[s]hift the model[']s image on the box to the left so you can see more of her lips" and "[m]ake the model's image with a tad bit more of a flirty/smiley/approachable."  PX 27; Tr. 215–16.  Ezriel admitted that he understood that these comments applied to the use of the models' pictures in the entire Wilhelmina line of health and beautify products, including cosmetics, skin care, and, significant here, perfume. Tr. 223–24.

Ezriel also testified that the meeting lasted "a long time"; however, he testified, he attended it for only five or 10 minutes, because, he stated, he felt uncomfortable surrounded by scantily clad models.  Tr. 50–51.  After Ezriel left, Katz, who had no such qualms, took the lead on behalf of Exceed.   Tr. 50–51.

On March 3, 2014, Katz emailed Aini, "Have you forwarded this email with all the changes to Anna [Urban]?  Once everything is changed I will have my scents person come down to the office to discuss with their team and mock up some samples."  PX 28 at 2.  Later that day,

after Aini informed Katz that he had sent the comments to Urban, Katz replied, "Great the second we get them we need to go back to the mock up place, make new samples, then I will get the scents for it and by that time I will have a sales plan for you including the price for the box/item." *Id.* at 1.

Ezriel testified that he did not know what Katz was talking about in these emails, and that, in sending the emails dated March 3, 2014, Katz was acting on his own.  Tr. 222.  However, Ezriel also testified that Katz would never go into any line of business without him.  Tr. 222.  At the time of these emails, Ezriel was being held out as president of Exceed; his brother, Abraham, was an employee of Exceed and a salesman for Ouleaf; and there was no other person at Exceed who might plausibly have been termed a "scents person."  Tr. 217, 219.

This assembled evidence, documentary and testimonial, overwhelmingly establishes that Ezriel's involvement in the Wilhelmina venture pertained—at least in substantial part—to fragrances.  Ezriel participated in the venture by commenting on the designs and on how to obtain the comps, and by attending the meeting on February 28, 2014.  The visual designs showed a perfume bottle, a perfume roller, and used the French words "Eau de Parfume Spray" and "Eau de Toilette Spray," which Ezriel admitted pertain to fragrances.  Ezriel's fellow participants in the venture, including Katz, sent emails referring to fragrances and bottles, and Ezriel admitted that there was no discussion about putting cosmetics in bottles.  Ezriel's attempts in testimony to limit the scope of his involvement in Wilhelmina are not credible and, in any event, do not erase the fact of his admitted participation in aspects of the venture that concerned the marketing of perfumes.  The Wilhelmina venture is another instance in which, the Court finds, Ezriel knowingly assisted a competitor of Fragrance Acquisitions.

### F.  Bases for the Court's Credibility Determinations

The Court has, at various points in this opinion, made adverse credibility determinations as to specific aspects of Ezriel's and Abraham's testimony.  The Court has not come to these conclusions lightly.  But the evidence admits no other conclusion.  This testimony reflects a dismaying pattern of evasiveness and minimization, with the evident goal of distancing Ezriel from perfume ventures that competed or stood to compete with Fragrance Acquisitions.  These include (1) Abraham's denial that he had asked Ezriel to call Radames Tirado on his behalf, refuted by Tirado's affidavit and his own brother's admission; (2) both brothers' unbelievable attempts to sanitize their trip together to YM in Toronto, beginning with their denial, later recanted, that they had in fact so travelled, continuing with Ezriel's far-fetched claim to have confused the names Abe Katz and Abraham Polatsek, and continuing yet further with Abraham's denial of knowing that Ezriel had met with YM or that Ezriel "was in Toronto on the same week"; (3) Abraham's implausible claim that he had persuaded 10 retail chains to purchase Ouleaf's products by cold-calling the main line for each retail chain, with no help from his brother, even though Abraham's sales experience was minimal and unsuccessful, Ezriel had given him similar help and customer introductions in his prior business venture for Fine Line, and Abraham's presentation in court was entirely inconsistent with that of a gifted salesperson; and (4) Ezriel's denial that his involvement with Wilhelmina concerned perfumes, even though the emails and the invoice plainly referred to fragrances or bottles, and even though, as he was forced to admit in court, the drawings on which he commented on displayed perfume bottles and rollers and the words "Eau de Parfume Spray" and "Eau de Toilette Spray."  The Court finds in each of their testimony a pattern of falsehoods and self-serving evasions.  To the extent either

brother's testimony on its face would support the facts they assert in defending against plaintiffs'

motion, the Court rejects it.

## II.      Applicable Legal Standards

Under the familiar four-factor test for the issuance of a preliminary injunction, plaintiffs

must demonstrate: (1) a likelihood of success on the merits, or sufficiently serious questions

going to the merits to make them a fair ground for litigation and a balance of hardships tipping

decidedly in the plaintiff's favor, (2) irreparable injury in the absence of an injunction, paying

particular attention to whether remedies at law are adequate to compensate for that injury, (3)

that the balance of hardships tips in the applicant's favor, and (4) that the public interest would

not be disserved by granting the injunction.  *See Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir.

2010).

## III.     Discussion

For the reasons that follow, plaintiffs have comfortably satisfied all four factors required

for the issuance of a preliminary injunction.  The Court will therefore preliminarily enjoin Ezriel

Polatsek from violating the non-compete agreements contained in the APA and the Employment

Agreement.

### A.  Likelihood of Success on the Merits

The APA's non-compete agreement states that Ezriel may not:

> directly or indirectly . . . own, manage, operate, join, control, participate in, invest
> in or otherwise be connected or associated with, in any manner . . . any business or
> venture which, directly or indirectly, competes with the Business within the
> territories in which the products of the Business are sold (which includes the United
> States of America, its territories and possessions, and any country outside of the
> United States of America to which products of the Business are sold).

APA § 6.1; *see also* APA § 1.1 ("'Business' means the production, marketing and distribution of

designer-inspired fragrances, private label fragrances, proprietary fragrances, and licensed

celebrity fragrances as conducted by or on behalf of the Companies."); Employment Agreement
§ 7(D) (similar non-compete agreement).

The Court readily concludes, on the evidence before it, that Ezriel has repeatedly
breached the non-compete agreements.  He breached the agreements both by calling Radames
Tirado and by traveling to Toronto to help Abraham market Ouleaf's perfumes.  *See infra*
Section I.D.3–4.  Ouleaf competes with Fragrance Acquisitions to sell perfumes.  Tr. 226, 274.
This conduct necessarily caused Ezriel to "participate in" or "be connected or associated with" a
business that competes with Fragrance Acquisitions.  Ezriel's participation in such conduct, and
his persistent if unavailing efforts to cover it up, would alone support a finding of a likelihood of
success on the merits.

In any event, the Court further finds that Ezriel also breached the agreements by working
on the Wilhelmina project, which was directed, at least in part, at selling perfumes.  *See infra*
Section I.E.4.  At argument, Ezriel's counsel suggested that even if the Wilhelmina project was
directed at fragrances, it did not compete with the "Business" as defined by § 1.1 of the APA,
which defines "Business" to mean "the production, marketing and distribution of designer-
inspired fragrances, private label fragrances, proprietary fragrances, and licensed celebrity
fragrances as conducted by or on behalf of the Companies."  *See* Tr. 388.  But Ezriel's counsel
did not explain why the Wilhelmina fragrances are not reasonably so categorized.  That
Fragrance Acquisitions was originally approached about providing the fragrances for Wilhelmina
indicates that the Wilhelmina venture was, at least originally, intended to use the kind of
fragrances that Fragrance Acquisitions supplies, *e.g.*, designer-inspired or private label
fragrances.  Accordingly, the Court concludes that the Wilhelmina venture constituted a breach
of the non-compete agreement.

42

Ezriel makes three main arguments to avoid the conclusion that he breached the non-compete agreements.

First, Ezriel argues that his involvement in the Wilhelmina project did not constitute a violation of the non-compete agreement, because no sales resulted and Fragrance Acquisitions suffered no "significant losses." Tr. 387–89. But the non-compete agreement does not prohibit only successful competition with Preferred Fragrances; it prohibits *all* such competition. *See* APA § 6.1(a) (Ezriel cannot "participate in . . . or otherwise be connected or associated with . . . any business or venture which, directly or indirectly, competes with the Business."). And, to the extent Ezriel relies on the inclusion of the phrase "significant losses" earlier in the non-compete paragraph, Tr. 389, he misreads the agreement. The phrase "significant losses" comes from the first, prefatory sentence of the paragraph containing the non-compete agreement. It reads: "Each of the Company and the Stockholders acknowledges the highly competitive nature of the Business and that the Business would be irreparably damaged if any such individual were to directly or indirectly provide services to any Person competing with the Business and that such direct or indirect competition would result in significant losses to the Business." APA § 6.1(a). That sentence does not limit the non-compete prohibition. This prefatory language is instead there to explain the need for such a provision.

Second, Ezriel challenges the validity of the non-compete agreements. He argues that he was fraudulently induced to sign the APA and the Employment Agreement containing the non-compete agreements, because, he claims, plaintiffs intended all along to fire him after two years. Dkt. 119 ("Def. Br") at 4. The only evidence he cites, at this stage, in support of this claim, however, is the ostensibly suspicious fact that, because plaintiffs fired him two years after they purchased the company, his two non-compete agreements terminate within a day of each other.

43

*Id.* at 5.  That coincidence in timing is indeed quirky.  But, without more, it does not support an inference—much less credibly support—the claim that plaintiffs intended all along to fire Ezriel at the two-year mark.  Ezriel does not explain how the coincidental timing benefited plaintiffs so as to evidence a nefarious scheme.  The coincidental timing, if anything, suggests that plaintiffs did not originally intend to fire Ezriel when they did.  Had they intended at the outset to fire him at the two-year mark, there presumably would have been no need for two separate non-compete agreements.  Indeed, had plaintiffs fired Ezriel later, they would have extended the duration of the non-compete prohibition.

Third, Ezriel argues that the non-compete agreements are unenforceable.  *Id.* at 5–7.  He challenges the three- and five-year durations of the non-compete provision, arguing, *inter alia*, that a five-year non-compete provision is excessive because it is equal to one-third of his 15 years of prior experience in the industry.  *Id.* at 6.  In fact, the law permits such a restriction: "New York courts have found three to five year restrictions reasonable in the context of the sale of a business."  *Pontone v. York Grp., Inc.*, No. 08 Civ. 6314 (WHP), 2008 WL 4539488, at *5 (S.D.N.Y. Oct. 10, 2008) (citing cases).  Ezriel separately argues that the non-compete agreements are unreasonable in scope because, "according to Plaintiffs, Polatsek cannot work in the beauty aids industry during this extensive period because all beauty aids are remotely or tangentially connected to fragrances."  Def. Br. 6–7.  But plaintiffs have never so argued and, in fact, have disclaimed any intention to seek to ban Ezriel from competing as to non-fragrance cosmetics.  *See* Dkt. 122 ("Pl. Reply Br.") at 3.  Plaintiffs instead make a more tailored request for prohibiting Ezriel from competing solely in the area of fragrance products.  That some designs on which Ezriel assisted Wilhelmina were apparently for use with both fragrance and non-fragrance products does not make the non-compete unenforceable or expand its scope.  In

44

such circumstances, the onus is on Ezriel to assure that his actions, whatever their permitted purposes, do not also further a competing fragrance venture.

Ezriel next argues that the geographic scope of the non-compete agreements is unreasonable because they extend to the "entire world," Def. Br. 7, but that is not so.  Rather, the non-compete agreements extend to "the territories in which the products of the Business are sold (which includes the United States of America, its territories and possessions, and any country outside of the United States of America to which products of the Business are sold)."  APA § 6.1(a).

Finally, Ezriel argues that plaintiffs breached the APA and Employment Agreement by preventing him from fulfilling his duties as President and COO and that, as a result of this breach, the non-compete provision is unenforceable against him.  Def. Br. 7.  But the case on which Ezriel relies stands for a different proposition: that a non-compete agreement is not enforceable when the subject employee is terminated without cause.  *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) ("Enforcing a noncompetition provision when the employee has been discharged without cause 'would be 'unconscionable' because it would destroy the mutuality of obligation on which a covenant not to compete is based.'") (quoting *Morris v. Schroder Capital Mgmt. Int'l*, 445 F.3d 525, 529–30 (2d Cir. 2006)).  Ezriel has not adduced evidence that his termination was other than for cause; whether he is right or wrong on

that point, that issue was simply not litigated on this motion. The Court has no basis on which to conclude that the non-compete agreements are unenforceable.

On the record before the Court, the non-compete agreements are valid, and Ezriel has breached them.

### B. Irreparable Injury

"The Second Circuit has rejected the proposition 'that irreparable harm must inevitably be assumed in breach of covenant cases.'" *Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, No. 10 Civ. 8976 (RJH), 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012) (quoting *Baker's Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987)). "'Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case.'" *Id.* (quoting *Baker's Aid*, 830 F.2d at 15). "In general, 'a loss of prospective goodwill can constitute irreparable harm,' though 'not where the loss of goodwill was doubtful and lost profits could be compensated with money damages.'" *Id.* (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) and *John E. Andrus Meml, Inc. v. Daines*, 600 F. Supp. 2d 563, 571 (S.D.N.Y. 2009)). "'Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm.'" *Id.* (quoting *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004)). "On the other hand, 'conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm.'" *Id.* (quoting *Shepard Indus., Inc. v. 135 East 57th Street, LLC*, No. 97 Civ. 8447 (DAB), 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999)).

Here, plaintiffs argue that, absent an injunction, Ezriel will continue his infringing behavior, including attracting customers to Ouleaf and selling fragrances with Wilhelmina, and that such competition would work an irreparable injury.  Dkt. 114 ("Pl. Br.") 22–23.  Ezriel responds that an injunction is unnecessary because any damages caused by his breach can be readily quantified.  Def. Br. 11–13.

Ezriel might be right if his infringements would cause Fragrance Acquisitions to lose defined sales only for a defined period of time.  But infringing competition would likely cause Fragrance Acquisitions to lose future sales, goodwill, and entire client accounts, and these are not so easily quantified.  *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."); Tr. 20 ("Our company is – we don't have a brand name to dictate.  So everything is based on relationships.").  There is nothing in the record here to suggest that this is the unusual case in which the loss of goodwill and client relationships would be readily remedied by money damages.  On the contrary, the parties have agreed otherwise: specifically, that any breach of the non-compete agreement "may result in irreparable harm and continuing damages to the Employer and its business and that the Employer's remedy at law for any such breach or anticipated or threatened breach will be inadequate."  Employment Agreement § 7(M); *see Roswell Capital Partners LLC v. Alternative Const. Technologies*, No. 08 Civ. 10647 (DLC), 2009 WL 222348, at *17 (S.D.N.Y. Jan. 30, 2009) ("While not dispositive, courts may view [such terms] as evidence of an admission that irreparable harm has occurred.").

Ezriel also denies that any harm is imminent, because he is no longer involved with Exceed or the Wilhelmina venture.  But, having demonstrated in multiple contexts that he is

47

ready, willing, and able to breach the non-compete, plaintiffs do not have to prove the precise manner in which, or identify the precise vehicle through which, Ezriel is likely to compete with them in the future.  In light of Ezriel's multiple breaches and in light of his attempts to cover up these breaches, including through false testimony, the Court concludes that, absent an injunction, a future breach is likely.  In any event, given Ezriel's unreliable testimony, his representations that he is no longer involved in Exceed or Wilhelmina cannot be taken as true.

Accordingly, the Court finds that, without injunctive relief, plaintiffs would suffer irreparable injury.

### C.  The Balance of Hardships

The balance of hardships is heavily in plaintiffs' favor.  The injunction that plaintiffs seek would merely bar Ezriel from violating his non-compete agreements.  It would not impose any new legal duty on him; instead it would give necessary teeth to an existing contractual duty.  Plaintiffs, by contrast, would suffer a substantial hardship if their request were denied, because Ezriel would be likely to continue his breach of the non-compete.  Ezriel argues that an injunction (even one that mirrored the existing non-compete provisions) would damage his reputation.  But that claim is speculative and, in any event, it would be perverse to deny well-merited injunctive relief solely because people might then think ill of a defendant whose infringements have been established so as to justify such relief.

### D.  Public Interest

The public interest would not be disserved by the grant or denial of this injunction.  The injunction arises in the context of a commercial matter between two private parties.  If anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements.

In sum, plaintiffs have met their burden under the four-factor test.  The Court will enjoin Ezriel from violating the non-compete agreements.

**E.  Fees**

Plaintiffs seek fees incurred in this preliminary injunction litigation, pursuant to the fee-shifting provision in § 7(M) of the Employment Agreement.  It reads: "Subject to Paragraph 19, the Executive further agrees to pay all of the Employer's costs and expenses, including reasonable attorneys' and accountants' fees, incurred in enforcing such covenants." Employment Agreement § 7(M); *see also id.* § 19 ("In any litigation, arbitration, or other proceeding by which one party seeks to enforce its rights under this Agreement or seeks a declaration of rights or obligations under this Agreement, the ultimate prevailing party shall be awarded its reasonable attorneys fees and costs and expenses incurred."); *Netjets Aviation, Inc. v. LHC Commc'n, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) ("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear.").

In his opposition brief, Ezriel did not respond to this request for fees.  At argument, however, his counsel argued that § 7(M)'s reference to "enforcing" means that fees are only due after a final determination on the merits.  Dkt. 137 at 43.  But the term "enforcing" does not distinguish between preliminary and final enforcement.  Plaintiffs' effort to preliminarily enjoin Ezriel from violating the restrictive covenants is a covered example of "enforcing such covenants."

This conclusion is consistent with the statement in § 7(M) that it is "[s]ubject to Paragraph 19," which grants fees to "the ultimate prevailing party."  In order to be more than surplusage, § 7(M)'s grant of fee awards "incurred in enforcing such covenants" must allow for

fee awards to parties who are not, at least yet, "the ultimate prevailing party"—such as a party that has enforced the covenants through a preliminary injunction but has not yet succeeded on the ultimate merits.

Finally, this conclusion is further buttressed by the rule in applications for fees under 42 U.S.C. § 1988 that, "[w]hen a party receives a stay or preliminary injunction but never obtains a final judgment, attorney's fees are proper if the court's action in granting the preliminary injunction is governed by its assessment of the merits." *Haley v. Pataki*, 106 F.3d 478, 483 (2d Cir. 1997); *see also Cumulus Broad. v. Okesson*, 3:10CV315 (JCH), 2012 WL 3822019, at *2 (D. Conn. Sept. 4, 2012) ("Although *Sole* was a § 1983 case seeking fees under § 1988(b), which required the movant to qualify as a 'prevailing party', the spirit of Justice Ginsburg's observation is not undercut merely because the fees are sought pursuant to a contractual fee-shifting provision."). Today's preliminary injunction decision is governed by the Court's assessment of the merits of plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, the Court preliminarily enjoins Ezriel Polatsek from violating the non-compete agreements contained in the APA and the Employment Agreement, and grants plaintiffs reasonable fees incurred in obtaining this preliminary injunction. Counsel are directed to meet and confer by Wednesday, July 16, 2014 to discuss the calculation of reasonable fees. Counsel are directed to submit a joint letter to the Court by July 18, 2014 reporting whether they have reached agreement on the amount of such fees. If they have not, the Court will promptly set a highly expedited schedule for briefing on that issue.

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 113.

SO ORDERED.

_____
Paul A. Engelmayer
United States District Judge

Dated: July 10, 2014
       New York, New York

51